IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ERIC STEIN, M.D.      :
           :  CIVIL ACTION
  v.         :
           :  21-3546
PAUL REVERE LIFE INSURANCE. CO. :

## MEMORANDUM

**Chief Judge Juan R. Sánchez**           **March 16, 2023**

Plaintiff Eric Stein, M.D. brings this action against Defendant Paul Revere Life Insurance Company ("Paul Revere") to recover lifetime disability benefits, alleging breach of contract or, in the alternative, an ERISA claim. Both parties now move for summary judgment. Because the cause of Stein's permanent disability was an accidental bodily injury, his motion for summary judgment shall be granted and Paul Revere's motion shall be denied.

## FACTUAL BACKGROUND[1]

Eric Stein is a medical doctor who specialized in interventional radiology.[2] Stein now resides in Maine, but he lived in the Philadelphia suburbs and practiced with Radiology Associates

---

[1] With a very few exceptions of no consequence for purposes of ruling on these motions, both parties have admitted nearly all of the averments contained in the other's Statement of Material Undisputed Facts. The factual background is therefore taken from those Statements and the attached exhibits

[2] Unlike diagnostic radiology, interventional radiology involves performing a variety of technically complex vascular and non-vascular procedures which often can last hours. Typically, interventional radiologists perform several procedures each day during which they are required to wear personal protective garments (such as a heavy lead apron) while reaching, bending, twisting, and moving equipment. They often remain standing throughout the duration of each procedure. Pl.'s Ex. 2, ECF No. 22-4.

of the Main Line in Bryn Mawr, Pennsylvania for over thirty years. Compl. ¶¶ 1, 3, 5, ECF No. 1. Paul Revere[3] is a Massachusetts corporation with its principal place of business there.[4] In October of 1989, it issued an individual Long-Term Disability (LTD) policy to Stein which was in force throughout his career with Radiology Associates. Pl.'s Statement Mat. Undisputed Facts (hereafter "Pl.'s Statement"), ¶¶ 1, 14, ECF No. 22-2; Def.'s Mot. Summ. J., Ex. 1, ECF No. 23-3. The policy provided for payment of disability income benefits for losses due to injury or sickness of up to $6,000 per month. This amount was the same monthly payment afforded under the Lifetime Total Disability rider which was also part of Stein's policy. Pl.'s Statement, ¶ 15; Def.'s Statement Mat. Undisputed Facts (hereafter "Def.'s Statement"), ¶¶ 6, 15, ECF No. 23-2.

Part 1 of the policy defined "Injury" as "accidental bodily injury sustained after the Date of issue and while Your Policy is in force," and "Sickness" as "sickness or disease other than a Pre-existing Condition which causes loss commencing while Your Policy is in force." Def.'s Statement, ¶¶ 16, 17; Def.'s Ex. 1, Policy ¶¶ 1.5, 1.6, ECF Nos. 23-2, 23-3. Finally, the policy defined a "Pre-Existing Condition" as "a Sickness or physical condition for which medical advice or treatment was recommended by or received from a Physician within a five-year period preceding the Date of issue." Def.'s Statement, ¶ 20; Policy ¶ 1.10. The policy did not define

---

[3] Paul Revere Life Insurance Company is affiliated with the Unum group of insurers and Unum's claims representatives handled the claims process in this case. Pl.'s Statement Mat. Undisputed Facts, ¶ 14 n. 2, ECF No. 22-2.

[4] The Complaint premised jurisdiction on the diverse citizenship of the parties pursuant to 28 U.S.C. § 1332, but because Paul Revere "asserts the policy is covered by ERISA, which plaintiff denies," the Complaint contained two claims: for breach of contract and, "in the alternative for benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B)." Compl., ¶ 31. Notwithstanding Stein's denial, both parties' summary judgment briefing treats this matter only as one for benefits under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461. And, given that state common law claims for improper processing of disability claims are completely pre-empted by ERISA, there is no need to address Stein's breach contract claim. *Pilot Life Ins. v. Dedeaux*, 481 U.S. 41 (1987); 29 U.S.C. § 1144(a).

"disease," "accidental," or "bodily injury."  Pl.'s Statement, ¶ 15.  The policy also stated: "[i]f a Disability is caused by more than one Injury or Sickness, or from both, We will pay benefits as if the Disability was caused by only one Injury or Sickness."  Def.'s Statement, ¶ 23; Def.'s Ex. 1, Policy ¶ 6.2.  And as noted, the policy also included a lifetime payment of benefits rider for a disability that begins before age 65.  Under this rider, Stein was entitled to the full monthly disability benefit for life in case of an injury but to only 10% of the benefit for a sickness after an initial 30-month period.  Pl.'s Statement Mat. Undisputed Facts, ¶ 17; Def.'s Statement, ¶ 24.

In 2009, Stein began experiencing sciatic and gluteal pain, lower back pain and stiffness, and pain and mobility problems in his left thumb.  Def.'s Statement, ¶¶ 35-37; Def.'s Ex. 3.  He did not seek treatment for these problems until December 2011 when he saw his primary care physician, Dr. Gerard Klinzing.  Def.'s Statement, ¶¶ 58-59; Def.'s Ex. 5.  Dr. Klinzing diagnosed Stein as suffering from, *inter alia,* spinal stenosis, lumbar osteoarthritis, and lumbar spondylosis. *Id.*  Dr. Klinzing noted Stein could not "wear a lead shield without worse pain," and Dr. Klinzing eventually advised Stein to stop working effective May 25, 2018.  Def.'s Statement, ¶¶ 60-61; Def.'s Ex. 5.

In addition to Dr. Klinzing, Stein also consulted Dr. James Harrop, a neurosurgeon at Thomas Jefferson University Hospital in March 2017.  Pl.'s Statement, ¶ 9.  Following an examination and review of medical imaging, Dr. Harrop diagnosed Stein with degenerative spondylolisthesis and osteoarthritis of the lumbar spine.  *Id.*, ¶ 10.  Stein continued to treat with both providers, and they prescribed pain-relieving medications, aquatic therapy, chiropractic care, and acupuncture.  Pl.'s Ex. 3.  By April 2018, Stein's lower back pain had worsened; it was more persistent, accompanied by numbness in his legs, and severely restricted his activities of daily living and lifestyle.  Pl.'s Ex. 3.  Because Stein could no longer wear lead shields at work, Dr.

Klinzing found he was disabled and needed spinal surgery.  *Id.*; Pl.'s Statement, ¶ 11-13; Def.'s Statement, ¶¶ 60-63.  However, Stein did not have the recommended spinal fusion surgery until January 2020 when it was performed by Dr. Harrop.  *Id.*

On June 1, 2018, Stein applied for benefits under the Paul Revere policy.  Pl.'s Statement, ¶ 18; Def.'s Statement, ¶ 27.  On his Individual Disability Claim Form, Stein stated he first noticed his symptoms "on or about 2009," the date his illness began was "on or about 2009," the date he was first treated was "on or before 2017," his disability began "before May 2018," and his last day worked was "May 25, 2018."  Def.'s Statement, ¶¶ 30-31; Pl.'s Ex. 1.  Stein did not fill in the "injury/accident" portion of the form.  Instead, he completed the section for "sickness," noting his medical conditions were "Spondylolisthesis L-4 - L5; spinal stenosis, severe osteoarthritis left thumb."  Pl.'s Ex. 1.  When asked to indicate whether his condition was related to his occupation, whether he had filed a worker's compensation claim, and whether he intended to file a worker's compensation claim, Stein checked the boxes for "no."  *Id.*  Def.'s Statement, ¶¶ 32-33, 39-41.  However, in selecting the "sickness" designation, Stein stated: "[m]y occupation exacerbates my condition."  Pl.'s Ex. 1.

Paul Revere approved Stein's claim for LTD benefits on August 7, 2018 due to sickness and deemed him to be totally disabled from "May 26, 2018 to ongoing."  Pl.'s Statement, ¶ 20. Paul Revere also indicated it would assess whether his claim should be opened with an earlier disability date of January 15, 2018, the date on which he reduced his work schedule and duties. *Id.*; Pl.'s Ex. 5; Def.'s Statement, ¶¶80-82.  The letter also stated: "[w]e have determined your total disability is due to a sickness and your benefit period is February 24, 2021."  Pl.'s Ex. 5.  On November 20, 2018, Paul Revere confirmed approval of an earlier disability onset date of January

15, 2018 and adjusted his claim accordingly.  Stein's benefit period was changed from February 24, 2021, to October 15, 2020.  Def.'s Statement, ¶¶89-92; Def.'s Ex. 14.

Stein was 64 years old at the onset of his disability in 2018.  Pl.'s Statement, ¶20.  Paul Revere awarded Stein the full monthly payment of $6,000 which eventually increased to $6,480 with cost-of-living adjustments.  *Id.*  Following Stein's surgery, Dr. Harrop was "very concerned with him using lead or extra weight to his spine," believing "this will intensify and magnified (sic) his axial back pain at point where he is slowly improving."  *Id.*, ¶ 21; Pl.'s Ex. 3.  Stein therefore never returned to work.

Because Stein's disability benefits had been granted due to sickness, Paul Revere reviewed the manner in which Stein's Lifetime total Disability benefits were being calculated under the Lifetime Total Disability Rider which limited payouts to 10% of the benefit after an initial 30-month period.  In letters dated June 14, 2019 and June 15, 2020, Paul Revere advised Stein that because he was disabled as a result of a "Sickness", his monthly benefit would be calculated based on the table provided in the rider and would be reduced to $648 as of October 15, 2020.  Def.'s Statement, ¶¶ 96-99; Def.'s Ex. Nos. 16, 17.  On December 22, 2020, Stein disputed the determination that his benefits should be reduced on the basis that he was disabled due to a "sickness" for the first time.  He demanded that Paul Revere re-classify his total disability as due to an "injury," and pay him the full benefit due retroactive to October 15, 2020.  Def.'s Statement, ¶¶ 100-101; Def.'s Ex. 4; Pl.'s Ex. 6.  In support of this re-classification request, Stein's counsel subsequently sent a letter from Dr. Harrop which stated in relevant part:

> I first saw Dr. Eric Stein as an outpatient in March of 2017 for a complaint of severe low back pain which [he] described as located on both sides of the sacrum with some radiation down the back of both legs along with occasional numbness in his lower legs.  He indicated that his symptoms had gradually worsened over a period of several years and were aggravated by wearing a lead apron which he is required to do in his field as an Interventional Radiologist.

5

. . .

> In discussion with Dr. Stein, he told me that his job required him to wear a wrap-around lead apron for procedures which he had been doing continuously since the early 1980s. … I believe that the imaging findings seen on his MRI and his symptoms are consistent with a repetitive stress injury aggravated by many years of performing procedures while wearing a heavy wrap-around lead apron to protect him from radiation. Given his history, his imaging findings are most accurately characterized as a repetitive stress injury rather than an illness or disease.

Pl.'s Statement, ¶ 24; Pl.'s Ex. 6; Def.'s Statement, ¶¶ 105-112; Def.'s Ex. 21. Stein also submitted a medical journal article supporting the connection between wearing leaded aprons and spinal problems. That article, "Occupational Health Hazards in the Interventional Laboratory: Time for a Safer Environment," and published in Vol. 250 Radiology 538, 539 (2009) provided in pertinent part:

> What appears to be an epidemic of orthopedic injuries is believed to be related to wearing heavy and uncomfortable personal protective apparel (*i.e.,* "lead" aprons) for radiation protection during procedures. Surveys of cardiologists and radiologists conclude that there is evidence of a relationship between wearing leaded aprons and spine problems (1, 3, 12, 13).

Pl.'s Statement, ¶ 33.

In response, Paul Revere undertook a clinical analysis of the origins and cause of Stein's condition. This analysis concluded that "the etiology of [Stein's] condition is unclear and further information is required." Def.'s Statement, ¶ 102-103; Def.'s Ex. 18. Paul Revere then obtained paper reviews of Stein's medical records from two physicians: Dr. Megan O'Bryan, board certified in family medicine, and Dr. Norman Bress, a board-certified rheumatologist. *Id.*, ¶ 26. Dr. O'Bryan concluded the radiologic findings and diagnoses were "consistent with degenerative disease affecting the lumbar spine rather than injury to the lumbar spine." *Id.*, ¶ 27; Pl.'s Ex. 7.

Dr. Bress similarly concluded Stein's diagnoses were degenerative conditions and "the etiology of OA (osteoarthritis) . . . is sickness." *Id.  See also*, Def.'s Statement, ¶¶ 117-136.

On May 25, 2021, Paul Revere denied Stein's reclassification request.  On June 21, 2021, Stein appealed on the following grounds: (1) Paul Revere's reviewing physicians lacked the appropriate qualifications to perform the review; (2) Dr. Bress's opinion was limited to the etiology of Stein's thumb osteoarthritis; and (3) Paul Revere and its physicians incorrectly restricted the term "injury" to conditions caused by a single traumatic event, as opposed to including conditions caused by repetitive stress.  Pl.'s Statement, ¶¶ 28, 29; Def.'s Statement, ¶¶ 137-144.  On July 2, 2021, Paul Revere obtained an additional medical review from Dr. Philip Lahey, a board-certified orthopedic surgeon.  Pl.'s Statement Mat. Undisputed Facts, ¶ 30; Def.'s Statement Mat. Undisputed Facts, ¶ 145.  After reviewing Stein's records, Dr. Lahey opined:

> "the etiology of the insured's low back pain is degenerative disc disease with degenerative spondylolisthesis and subsequent spinal fusion . . . the etiology of [degenerative disc disease] is as yet unknown, and . . . cannot be ascribed, beyond reasonable doubt, to repetitive stress injury more than any of the many other proposed causes of disc degeneration.  Whatever is the definition of "Accidental bodily injuries," the medical file does not provide a history of accident and the cause of his degenerative disc disease is unknown.

Pl.'s Statement, ¶ 30; Pl.'s Ex. 10.  Def.'s Statement, ¶¶ 145-146, 153.

Based on Dr. Lahey's opinion, Paul Revere informed Stein on July 9, 2021 that it was still inclined to deny his appeal, but it nevertheless offered him the opportunity to review Dr. Lahey's findings, and gave him until July 26, 2021 to respond.  Pl.'s Statement, ¶ 31; Pl.'s Ex. 10.  Stein's attorney responded on July 15, 2021.  He argued (1) Paul Revere was applying the wrong legal standard by excluding repetitive stress injuries from the definition of "injury;" (2) Dr. Lahey erred by using that incorrect standard to evaluate the origins of Stein's condition; (3) Dr. Lahey's application of a criminal law standard of proof to Stein's claim compounded the error; and (4) Dr.

Lahey's suggestion that the etiology of Stein's spinal pathologies was "unknown" was insufficient to overcome Dr. Harrop's contrary opinion in light of Dr. Harrop's qualifications and status as Stein's treating physician.  Pl.'s Statement Mat. Undisputed Facts, ¶ 32.  Nevertheless, Paul Revere issued its final decision denying Stein's claim on August 5, 2021, and Stein filed this action on August 9, 2021. Pl.'s Statement Mat. Undisputed Facts, ¶¶ 34-35; Pl.'s Ex. 12.  The parties filed their motions for summary judgment on October 19, 2022.

**STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a).  Thereafter, the court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  Only material facts which "might affect the outcome of the suit under governing law" will preclude summary judgment.  *Id.* at 248. "A genuine dispute exits 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Stone v. Troy Construction, LLC,* 935 F.3d 141, 148, n. 6 (3d Cir. 2019) (quoting *Anderson,* 477 U.S. at 248).  When considering a motion for summary judgment, the court must 'view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion.'"  *Salazar-Limon v. City of Houston,* 137 S. Ct. 1277, 1280 (2017) (quoting *Scott v. Harris*, 550 U.S. 372, 378, (2007)).  Where, as here, cross-motions for summary judgment are filed, "the court must rule on each party's motion on an individual and separate basis, determining for each side, whether a judgment may be entered in accordance with the Rule 56

standard." *Auto-Owners, Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (alteration, quotation marks, and citation omitted).

**DISCUSSION**

Stein's complaint asserts a claim for benefits under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), which empowers "a participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* In moving for summary judgment, Stein asserts that it is clear from the administrative record that his total disability was caused by the repetitive stress injuries which he sustained over the course of his career from having to wear a heavy lead protective apron while performing interventional radiologic procedures. Thus, he argues, he is entitled to the entry of a favorable judgment that he is entitled to the payment of monthly disability payments in the amount of $6,480 per month. By its cross-motion, Paul Revere contends the record supports its conclusion that Stein was disabled by a sickness within the meaning of the policy and hence its reduction in Stein's monthly benefit after thirty months to $648 was proper.

The Employee Retirement Income Security Act (ERISA), 29 U.S.C. 1001, *et. seq.,* "was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v.* Bruch, 489 U.S. 101, 113 (1989) (internal quotation marks and citations omitted).

In § 1132(a)(1)(B) actions seeking to recover benefits and/or challenging denials of benefits based on plan interpretations, the plaintiff bears the burden of proof to demonstrate that he is disabled by a preponderance of the evidence. *Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 472 (E.D. Pa. 2021). The standard of court review of a benefits decision is *de novo*

unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Firestone*, 489 U.S. at 115.  In that event, it is the arbitrary and capricious standard which applies.  *Id.*

Here, the parties have stipulated that Paul Revere's decision is properly reviewed under the *de novo* standard. Stip. Re: Governing Law, ECF No. 16.  Under a *de novo* standard, "the administrator's decision is accorded no deference or presumption of correctness."  *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (internal quotation marks and citation omitted).  "The *de novo* standard extends to both plan interpretation and factual findings, and the Court is not confined to the record before the Plan administrator," but may also consider supplemental evidence.  *Levine v. Life Ins. Co. of N. Am.*, 182 F. Supp. 3d 250, 258 (E.D. Pa. 2016) (citing *Luby v. Teamsters Health, Welfare, & Pension Trust Funds*, 944 F. 2d 1176, 1185 (3d Cir. 1991)); *Daniel S. Bowerman, D.C. v. Nat'l Life Ins. Co.,* Civ. No. 13-3345, 2014 U.S. Dist. LEXIS 173952 at *23 (E.D. Pa. Dec. 16, 2014).  However, "[i]f the record on review is sufficiently developed, the district court may, in its discretion, merely conduct a *de novo* review of the record of the administrator's decision, making its own independent benefit determination.  *Luby*, 944 F.2d at 1185.  Under this standard, the court must determine whether the administrator made a correct decision.  *Viera*, 642 F.3d at 413.  In assessing correctness, the court must review the record and determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan.  *Viera*, 642 F.3d at 413-414; *Levine*, 182 F. Supp. 3d at 258.

"Claims for benefits based on the terms of an ERISA plan are contractual in nature and are governed by federal common law contract principles."  *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 74 (3d Cir. 2011).  Thus, "where claims put at issue the meaning of plan terms," the courts "apply the federal common law of contract to interpret those terms."  *Id.*  Of course, "the

paramount goal of contract interpretation is to determine the intent of the parties." *Norfolk Southern Ry. Co. v. Pittsburgh & W.Va. R. R.*, 870 F.3d 244, 253 (3d Cir. 2017).  In determining intent, it is "not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior" that matters.  *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009).  "The strongest objective manifestation of intent is the language of the contract" and "the words of the contract clearly manifest the parties' intent if they are capable of only one objectively reasonable interpretation."  *Baldwin*, 636 F.3d at 76.

If, however, the words of the contract are capable of more than one objectively reasonable interpretation, the words are ambiguous.  *Id.*  And "[a]mbiguous terms that appear clear and unambiguous on their face, but whose meaning is made uncertain due to facts beyond the four corners of the contract, suffer from latent ambiguity."  *Id.* "When determining whether a contract is ambiguous, the words, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning" are all properly considered by the court. *Univ. Spine Ctr. v. Aetna, Inc.*, 774 F. App'x 60, 63 (3d Cir. 2019) (internal quotation marks and citations omitted).  But "where the words of the contract clearly manifest the parties' intent," there is no need to "resort to extrinsic aids or evidence."  *Gov't Emps. Ret. Sys. of the V. I. v. Gov't of the Virgin Islands*, 995 F.3d 66, 115 n. 30 (3d Cir. 2021).  And "[n]o matter the extrinsic evidence, 'the parties remain bound by the appropriate objective definition of the words they use to express their intent."  *Baldwin*, 636 F.3d at 76 (internal quotation marks and citation omitted).

Stein asserts Paul Revere's interpretation of the LTD policy is fundamentally flawed because it excludes repetitive trauma injuries from the definition of "injury," and so requires the Court to determine the meaning of an "accidental bodily injury sustained after the Date of issue and while Your Policy is in force."  Because there is no definitive or binding authority in the Third

Circuit, the parties each cite several non-binding cases in support of their positions.  Stein urges

the Court to follow *Chapman v. Unum Life Ins. Co. of Am.,* 555 F. Supp. 3d 713 (D. Minn. Aug.

18, 2021) as well as two other cases applying state law. [5]  Pl.'s Mem. Law Support Mot. Summ.

J., 11-12, ECF No. 22-1.  Paul Revere relies on *Bilezikian v. Unum Life Ins. Co.*, 692 F. Supp. 2d

1203 (C.D. Cal. 2010) and *Nehra v. Provident Life & Accident Ins. Co.*, 559 N.W. 48 (Mich.

1997).[6]

---

[5]  Dr. Chapman worked for nearly thirty years as an endodontist, a specialized form of dentistry
which required repetitive fine motor and delicate hand movements to perform procedures.  She
began experiencing pain in her hands at the age of 40; the pain grew worse over time and eventually
resulted in a degenerative arthritis diagnosis.  Chapman stopped working at 60 years of age.  The
Minnesota District Court applied the test set forth in *Wickman v. Northwestern National Insurance
Co.*, 908 F.2d 1077 (1st Cir. 1990) and held "the development of disabling arthritis from the
practice of endodontia is accidental."  *Chapman*, 555 F. Supp. 3d at 723.

Stein also cites to *Carney v. Paul Revere Life Insurance Co.*, 832 N.E.2d 257 (Ill. App. 2005)
and *Provident Life & Accident Insurance Co. v. Hallum*, 576 S.E. 2d 849 (Ga. 2003).  *Carney* is
distinguishable because the plaintiff's insurance policy was not part of an employee benefit plan
and so was not covered by ERISA.  The *Carney* court applied Illinois law and found that "in
Illinois, 'accidental' may mean either (1) an injury that is unexpected but may arise from a
conscious voluntary act (accidental result) or (2) an injury that is the unexpected result of an
unforeseen or unexpected act that was involuntarily or unintentionally done (accidental means)."
832 N.E. 2d at 268.  In applying that definition, the Court found no error in the trial court's decision
that the plaintiff surgeon's pronator teres syndrome (much like carpal tunnel syndrome) was an
injury which was properly classified as an unexpected result of his profession.

Similarly, in *Hallum,* the Georgia Supreme Court considered whether, under Georgia law, carpal
tunnel syndrome caused by repetitive hand motion should be classified as an injury or sickness as
those terms were used in the policy at issue.  The Court held the plaintiff was entitled to disability
benefits for an injury: "an unexpected physical injury that disables the insured is covered as an
'injury' because the 'focus' of the coverage of the plan is 'on the coverage of the injuries.'"
*Hallum*, 576 S.E. 2d at 851.  Thus, "[a] person could suffer a series of small traumas over an
extended period that ultimately resulted in a bodily injury that was disabling."  *Id.*

[6]  Both of these cases were decided under state laws.  In *Bilezikian*, the plaintiff orthopedic surgeon
sought to recover disability benefits for his carpal tunnel syndrome under a policy similar to
Stein's. The policy provided for greater benefits if the disability was due to an injury than to a
sickness.  In his initial application for benefits, Dr. Bilezikian only filled out the section of the
application for sickness and the injury section blank.  He later sought to have his disability re-
classified as an injury caused by a series of micro-traumas suffered in the course of his occupation.

Although instructive because "injury" was also defined in the preceding cases as an "accidental bodily injury," none of these cases is binding on this Court. However, the *Chapman* court, like several other Circuit courts and several federal courts in the Third Circuit,[7] utilized a test outlined by the First Circuit in *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990) "as the standard by which the Court determines whether a disability arises by 'accident' in the ERISA context." *Chapman*, 555 F. Supp. 3d at 721. In *Wickman*, the insurance company denied accidental death benefits to the widow of an insured decedent who fell or jumped

---

In upholding Unum's denial of benefits under the "injury" designation, the Central District of California held carpal tunnel syndrome is not considered an "accidental bodily injury" under California law because California requires a "sudden precipitating event" and "a disability caused by the cumulative effect of the insured's normal, work-related activity is not an 'accident.'" *Id.*, 692 F. Supp. 2d at 1216 (citing *Gin v. Pennsylvania Life Insurance Co.*, 134 Cal. Rptr. 4th 939, 945 (2005)).

*Nehra* is also similar to the instant action. In *Nehra*, the plaintiff dentist initially sought benefits under the sickness portion of his policy claiming disability due to a duodenal ulcer and carpal tunnel syndrome. Nehra's policy also defined "injury" as an "accidental bodily injury occurring while your policy is in force," and "sickness" as "sickness or disease which is first manifested while your policy is in force." *Nehra*, 559 N.W. at 49. Two years after he began receiving benefits and after his ulcer had healed, Dr. Nehra sought to have his disability recharacterized as an injury based on his ongoing carpal tunnel syndrome. In adjudicating the claim, the Michigan Supreme Court acknowledged the words "accident" and "injury" can have "shifting meanings depending on the factual context and the area of law in which they are being considered." *Id.* at 50. But given the facts of the case, the Court held the terms "accidental bodily injury" were "words of common understanding" which could thus "be given their ordinary meaning." Because the plaintiff's expert "ably explained that carpal tunnel syndrome is the product of prolonged repetition of hand movements," and "no single event caused the disability," coupled with the fact that "Dr. Nehra himself recognized the true nature of his disability when he initially identified it as a 'sickness,' not an accidental disability, … [t]he [trial] court did not err in agreeing with this assessment." *Id.* at 51.

[7] The parties have not cited, and the Court cannot find any case in which the Third Circuit Court of Appeals adopted the *Wickman* test. Nevertheless, several courts in this Circuit have employed it to address the meaning of the term "accident" in, *inter alia*, disability and accidental death insurance policy claims under ERISA. *See, e.g.*, *Riddle v. Life Ins. Co. of N. Am.*, Civ. No. 11-1034, 2011 U.S. Dist. LEXIS 117052 (D.N.J. Oct. 11, 2011); *Erbe v. Conn. Gen. Life Ins. Co.*, 695 F. Supp. 2d 232 (W.D. Pa. 2010); *Precopio v. Bankers Life & Cas. Co.*, Civ. No. 01-5721, 2004 U.S. Dist. LEXIS 30425 (D.N.J. Aug. 10, 2004).

some fifty feet from a bridge.  The policy in that case defined "accident" as an "unexpected, external, violent and sudden event."  The First Circuit upheld the trial court's denial of benefits because the deceased "knew or should have known that serious injury or death was a probable consequence substantially likely to occur as a result of his volitional act in placing himself outside the guardrail and hanging on with one hand."  *Wickman,* 908 F.2d at 1089.  Delving "into the metaphysical conundrum of what is an accident," the First Circuit rejected the distinction between "accidental means" and "accidental result" which many courts had previously used to decide the question.  *Wickman*, 908 F.2d at 1086.  Instead, the Court held "[t]he question comes down to what level of expectation is necessary for an act to constitute an accident; whether an intentional act proximately resulting in injury or only the injury itself must be accidental."  *Id.* at 1085.

Answering this question involves a two-step inquiry.  As summarized by the New Jersey District Court in its application of the *Wickman* decision:

> First, the fact-finder should attempt to ascertain whether the insured expected an injury similar to that suffered.  If the insured did not expect such an injury, the fact-finder must then ask whether that expectation was reasonable.  The reasonableness of the insured's expectation "should be made from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences." . . .  Next, if the evidence is insufficient to determine an insured's subjective expectation, the fact-finder should then engage in an objective analysis of a reasonable person's expectations.  "In this analysis, one must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct."  If a reasonable person would have expected the injury to occur as a result of the insured's actions, then the injury suffered is not an accident.

*Riddle v. Life Ins. Co. of N. Am.*, Civ. No. 11-1034, 2011 U.S. Dist. LEXIS 117052 at *12 (D.N.J. Oct. 11, 2011) (quoting *Wickman*, 908 F.2d at 1088).[8]

---

[8]  *Riddle* involved an action under ERISA to recover benefits under an Accidental Death and Dismemberment policy for the death of the insured which occurred when he failed to negotiate a turn while driving in excess of ninety miles per hour with a blood alcohol level of .222%.

The Court finds the *Wickman* analysis well-reasoned and *Chapman* persuasive, so both decisions will be applied to analyze the merits of Stein's ERISA claim.  The Court first considers whether Stein expected an injury similar to what he experienced.  As in *Chapman*, there is nothing in the record concerning Stein's subjective expectations about developing spinal stenosis, degenerative spondylolisthesis, lumbar spondylosis or osteoarthritis of the lumbar spine and thumb from more than thirty years of practicing interventional radiology.  The Court thus looks to what a reasonable person in Stein's position (*i.e.*, other interventional radiologists), with his knowledge and experience might know or reasonably believe, and the Court cannot find he would or should have known or expected that he was likely to develop these conditions.  This finding is borne out by Stein's treatment history: the fact that he and his treating physicians initially believed his conditions were more akin to a "sickness" than to an "injury;" Stein's notation that his "occupation exacerbates my condition;" and by the dates of the medical journal articles which Stein's counsel submitted in support of his request to re-characterize his disability (2009 and 2017).  Pl.'s Statement, ¶ 33; Pl.'s Ex. 6; ECF No. 22-4.  This evidence strongly suggests the connection between wearing heavy leaded aprons and other personal protective equipment while performing lengthy and complex interventional radiological procedures has only become apparent in recent years, and that the medical community's understanding of this connection is still evolving.  Hence,

---

Applying the *Wickman* test, the Court upheld the denial of benefits and the insurance company's finding that the insured's death was not accidental.  The Court reasoned that even if Riddle himself neither intended nor foresaw "any harm in attempting to drive while grossly intoxicated and at an extremely high rate of speed, a reasonable person would have known that driving while under the influence, very late at night and at highly unsafe speeds would likely result in serious bodily harm or death."  2011 U.S. Dist. LEXIS at 22.

the Court finds Stein did not expect to be injured by wearing personal protective equipment in the course of his work.

This conclusion does not end the inquiry.  As framed in *Chapman*, "[t]he next question is whether the [condition] is an 'injury.'" 555 F. Supp. 3d at 723.  When considering this question, the Court may look to state law for guidance, provided state law does not conflict with ERISA or its underlying policies."  *Id.*  (internal quotation marks and citation omitted).  In Pennsylvania, "bodily injury' requires physical injury."  *Babalola v. Donegal Grp, Inc.*, Civ. No. 08-621, 2008 U.S. Dist. LEXIS 65207 at *9 (M.D. Pa. Aug. 26, 2008) (citing *Coregis Ins. Co. v. City of Harrisburg*, 401 F. Supp. 2d 398, 404 (M.D. Pa. 2005)).  Here it is clear that Stein suffers from a physical condition brought on by repetitive stress injuries, as shown by his letter issued by his treating neurosurgeon's letter dated February 4, 2021.  Pl.'s Ex. 1.  Stein has been in treatment for years, and has tried numerous therapies, including aquatic therapy, chiropractic care, acupuncture, and pain medications.  He eventually underwent surgery.  Thus, the Court concludes Stein has been totally disabled as the result of an "accidental bodily injury" within the meaning of the Paul Revere LTD policy.[9]

---

[9]  Furthermore, as should be obvious from all of the foregoing, the LTD policy at issue in this case is "fairly susceptible of two different interpretations."  *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257 (3d Cir. 1993).  When this occurs, it is appropriate to construe terms of an ERISA plans through the rule of *contra proferentem.  Erbe*, 695 F. Supp. 2d at 248 (citing *Taylor v. Cont'l Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1233-34 (3d Cir. 1991)).  Under that rule, "if, after applying the normal principles of contractual construction, an insurance contract is susceptible of two different interpretations, . . . the interpretation that is most favorable to the insured will be adopted."  *Heasley*, 2 F.3d at 1257.  *See also, Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 231 (3d Cir. 1994) ("The *contra proferentem* doctrine holds that ambiguities in an insurance policy are to be resolved in favor of the insured.").  The Court's ruling is thus in keeping with this principle.

Stein also asks the Court to exercise its discretion under Section 502(g)(1) of ERISA[10] and direct Paul Revere to pay him reasonable attorneys' fees and costs.  He argues Paul Revere demonstrated bad faith by insisting on interpreting the policy as mandating a finding that he was disabled due to "sickness," rather than "injury."

"An award of attorneys' fees to a prevailing plaintiff in an ERISA case is within the discretion of the district court and may only be reversed for abuse of discretion."  *Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 305 (3d Cir. 2008).  The decision to award fees requires a two-step analysis.  *Templin v. Indep. Blue Cross*, 785 F.3d 861, 864 (3d Cir. 2015).  First, a court must determine whether the movant is eligible for an award, and if so, it must then consider the following factors:

> (1) the offending party's culpability or bad faith; (2) the ability of the offending party to satisfy the award of attorney's fees; (3) the deterrent effect of an award of attorney's fees; (4) the benefit conferred upon members of the plan as a whole; and (5) the relative merits of the parties' positions.

*Hahnemann*, 514 F.3d at 310; *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983).  "A party is culpable if it is blamable; censurable or at fault."  *Templin*, 785 F.3d 868.  Culpable conduct is "reprehensible or wrong" but need not involve "malice or guilty purpose."  *Id.* (internal quotation marks omitted).

In assessing these factors, the Court declines to award attorneys' fees and costs to Stein. While the Court assumes Paul Revere is capable of paying attorneys' fees, the Court does not find it acted in bad faith or is guilty of "culpable conduct."  As such, and in light of the relative merits of the parties' cases, there is no need to deter Paul Revere from behaving similarly in the future.

---

[10]  This section provides "[i]n any action under this subchapter … by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorneys fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).

It is not disputed that Paul Revere processed Stein's claim in a timely manner and promptly paid the monthly disability benefit throughout the first thirty months. Notwithstanding the Court's ruling, as evidenced by the discussion above, Paul Revere's interpretation of its policy language was reasonable. A number of courts throughout the country have agreed with its interpretation of "accidental bodily injury" and Stein himself first applied to receive benefits under the "sickness" category. The merits of the parties' positions here were relatively balanced and the Court recognizes other courts, including the Third Circuit, may disagree with this decision. As the above factors do not counsel in favor of an award of attorneys' fees and costs, Stein's request is denied.

**CONCLUSION**

Stein's motion for summary judgment will be granted and he is entitled to reclassification of his total disability as due to an "injury" under his LTD policy and to receive payment of disability benefits thereunder. Stein's request for attorneys' fees and costs under Section 502(g)(1) of ERISA will be denied. Because Paul Revere is not entitled to the entry of judgment in its favor as a matter of law, its motion for summary judgment is also denied.

An appropriate Order follows.

BY THE COURT:

/s/  Juan R. Sánchez

_____
Juan R. Sánchez,   C.J.